**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION**

| | |
|---|---|
| **J.S., A MINOR, BY HEATHER LYNN SITES AND JARET W. SITES AS NEXT FRIENDS,** | ) <br> ) <br> ) |
| Plaintiff | ) Civil No. 5:19-CV-0097 |
| | ) |
| v. | ) |
| | ) |
| **WINCHESTER PEDIATRIC CLINIC, P.C.,** | ) <br> ) |
| | ) **By:  Michael F. Urbanski** |
| | ) **Chief United States District Judge** |
| Defendant | ) |

## MEMORANDUM OPINION

Plaintiff J.S., represented by next friends, filed a lawsuit alleging that health care providers employed by defendant Winchester Pediatric Clinic, P.C. ("WPC") were negligent in their provision of care to him and that their negligence resulted in serious injury to him. Because J.S. had previously settled a lawsuit against other defendants for $2 million, the maximum amount of damages he could receive in a medical malpractice lawsuit capped under Virginia Code § 8.01-581.15, he seeks a declaratory judgment that the damages cap is unconstitutional. The court asked the parties to brief the issue of whether the constitutionality of the malpractice award cap is ripe for adjudication. The parties, along with the Commonwealth of Virginia which has appeared in the case, filed briefs on the issue of ripeness and the court held a hearing on November 23, 2020. Having considered the briefs and the argument presented at the hearing, the court finds that the matter is not ripe for declaratory relief at this time and **DENIES** J.S.'s request for such relief.

## I.

Plaintiff's complaint alleges the following facts. On February 2, 2010, when J.S. was 20 months old, the car in which he was riding was involved in an accident. J.S. was transported to the hospital where he presented with cervical pain. An X-ray was taken which appeared normal, and J.S. was discharged home. On February 8, 2010, J.S. saw his primary care physician at WPC with complaints of neck pain and was noted as crying in pain. WPC referred J.S. to the emergency department at the Winchester Medical Center. At that facility J.S. was examined and a CT scan was taken and read as normal before he was discharged with a pediatric Aspen collar. On February 11, 2010, J.S. returned to the Winchester Medical Center for an MRI of his cervical spine which was unremarkable. On February 19, 2010, J.S.'s mother called WPC and reported that J.S. was experiencing symptoms consistent with a spinal cord injury. On February 22, 2010, J.S.'s mother again called defendant WPC and reported that J.S. was experiencing symptoms consistent with a spinal cord injury, including that he would not walk. He was seen by a healthcare provider at WPC who referred him to physical therapy.

Over the next couple of years, J.S. developed chronic health and developmental problems including problems with his gait, gross and fine motor development, balance, tone, respiratory issues, and an overall failure to thrive. On May 8, 2012, J.S. was seen by a healthcare provider employed by WPC where he showed signs of a spinal cord injury, including an abnormal gait. He was referred to physical therapy.

In March 2015, J.S. had a CT scan and MRI of his cervical spine at West Virginia University Hospital which showed severe stenosis at the craniocervical junction resulting from an alignment abnormality of the odontoid process, severe spinal cord compressions, spinal

cord signal changes, and subluxation at the C1-C2 level. He immediately underwent a C1-C2 fusion. Since then, his health has improved, but he still suffers from severe and permanent neurological deficits. J.S. asserts that his lifelong medical costs stemming from the accident will be more than three million dollars.

J.S. alleges that he sustained cervical injuries in the car accident and that the injuries began a cervical spinal process that continued to worsen over the next five years. He asserts that had WPC agents or employees recognized his neurological symptoms and promptly referred him to the appropriate health care providers, his injuries likely would not have been permanent or would have been significantly lessened. Thus, he brings negligence claims against WPC.

In 2018, J.S. brought a lawsuit in Winchester Circuit Court against WPC and its employee physicians and also named the radiologists as defendants. In that lawsuit, the primary allegation was that the radiologists interpreted a CT scan and MRI scan as normal when the studies showed evidence of a spinal cord injury. J.S. alleged sparse allegations against WPC and its pediatrician defendants. (Ex. A to ECF No. 19-1.) The proceeding was non-suited on June 21, 2019. See Sites v. Winchester Pediatric Clinic, No. CL18000303-00 (Va. Cir. Ct. June 21, 2019).

J.S. next filed a lawsuit in this court, naming Winchester Radiologists, P.C., as defendants. See J.S. v. Winchester Radiologists, P.C., No. 5:18-cv-75 (W.D. Va., filed May 11, 2018). The radiologist defendants settled the case for the full amount of the Virginia medical malpractice cap. J.S. next filed the instant lawsuit against WPC alleging malpractice, and also seeking a declaratory judgment that the Virginia medical malpractice cap is unconstitutional.

At issue is whether the request for relief under the Declaratory Judgment Act is ripe for adjudication. The Commonwealth filed a notice of intervention, asserting that because the issue of the application of the medical malpractice statutory cap will not be implicated unless liability is first determined against WPC in an amount exceeding two million dollars, briefing of the constitutionality of the statute should be stayed until liability is determined. ECF No. 17. Plaintiff J.S. contends that the issue is ripe. ECF No. 18.

Defendant WPC contests liability and damages and argues that the issue is not ripe until liability has been determined. More particularly, WPC denies that its employees breached the standard of care or were negligent, or that their acts or omissions were the proximate cause of J.S.'s injuries, and asserts that J.S.'s injuries were caused by the intervening, superseding negligence of other healthcare providers such as the radiologists. WPC also contests that J.S.'s damages exceed the amount recovered in settlement from the other defendants. ECF No. 19.

## II.

The Declaratory Judgment Act, 28 U.S.C. § 2201, provides in relevant part the following:

> In a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

J.S. seeks a declaratory judgment that Virginia Code § 8.01-581.15 is unconstitutional because it violates the Seventh Amendment of the United States Constitution; the guarantees in the Fourteenth Amendment of the United States Constitution to due process, access to the courts, and equal protection; the Virginia constitutional guarantee of equal protection; the

separation of powers mandated by the Virginia Constitution; and the prohibition against special legislation mandated by art. IV of the Virginia Constitution.

> The Virginia malpractice damages cap statute provides the following:

> In any verdict returned against a health care provider in an action for malpractice where the act or acts of malpractice occurred on or after August 1, 1999, which is tried by a jury or in any judgment entered against a health care provider in such an action which is tried without a jury, the total amount recoverable for any injury to, or death of, a patient shall not exceed . . . $2 million.

Va. Code Ann. § 8.01-581.15.  The statute has been found constitutional by both the Fourth Circuit Court of Appeals and by the Supreme Court of Virginia. See Boyd v. Bulala, 877 F.2d 1191, 1195-97 (4th Cir. 1988) (citing Etheridge v. Medical Center Hospitals, 237 Va. 87, 376 S.E.2d 525 (1989)) (finding statute does not violate the right to trial by jury, separation of powers, due process or equal protection under the federal or Virginia constitutions and does not violate the anti-discrimination or special legislation clauses of the Virginia Constitution); Pulliam v. Coastal Emergency Servs. of Richmond, Inc., 257 Va. 1, 509 S.E.2d 307 (1999) (upholding constitutionality of damages cap)).

J.S. argues that since Boyd was decided, "the relevant constitutional principles have received significant elaboration that differ from that decision's understandings." ECF No. 18 at 16.  He points to three Supreme Court decisions he claims reveal a different attitude about applying Bill of Rights provisions to the states: Ramos v. Louisiana, 140 S.Ct. 1390 (2020) (discussing Sixth Amendment unanimity in jury trials); Timbs v. Indiana, 139 S.Ct. 682 (2019) (discussing Eighth Amendment Excessive Fines Clause) and McDonald v. Chicago, 561 U.S. 742 (2010) (discussing the Second Amendment). He appears to anticipate reviving the

argument that the Seventh Amendment right to a jury trial is violated by the statutory damages cap.

## III.

For a district court to have jurisdiction to enter a declaratory judgment, two conditions must be satisfied. The dispute must be a "case or controversy" in the context of Article III of the Constitution, and the trial court, in its discretion, must be satisfied that declaratory relief is appropriate. White v. National Union Fire Ins. Co. v. Pittsburgh, Pa., 913 F.2d 165, 167 (4th Cir. 1990).

## A.

The test for a "case or controversy" focuses on whether the dispute "'is definite and concrete, touching the legal relations of parties having adverse legal interests.'" White, 913 F.2d at 167 (quoting Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 240-41 (1937)). "'It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.'" Id. (quoting Haworth, 300 U.S. at 240-41). The difference between an abstract question and a controversy contemplated by the Declaratory Judgment Act is one of degree and there is no precise test in every case for determining whether such a controversy exists. Golden v. Zwickler, 394 U.S. 103, 108 (1969). "The question is 'whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" White, 913 F.2d at 167-68 (quoting Maryland Casualty Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 273 (1941)).

In addition to the restriction of jurisdiction to "cases or controversies," federal courts avoid deciding constitutional issues unless such a decision is unavoidable. Poe v. Ullman, 367 U.S. 497, 503 (1961). "[T]he adjudicatory process is most securely founded when it is exercised under impact of a lively conflict between antagonistic demands, actively pressed, which make resolution of the controverted issue a practical necessity." Id. The issues of whether a case or controversy exists and whether it is necessary to determine a constitutional question "press with special urgency in cases challenging legislative action or state judicial action as repugnant to the Constitution." Id.

"'This court can have no right to pronounce an abstract opinion upon the constitutionality of a State law. Such law must be brought into actual or threatened operation upon rights properly falling under judicial cognizance, or a remedy is not to be had here.'" Id. at 504 (quoting State of Georgia v. Stanton, 73 U.S. 50, 75 (6 Wall.) (1867); Cherokee Nation v. State of Georgia, 30 U.S. 1, 75 (5 Pet.) (1831) (Thompson, J., dissenting); State of New Jersey v. Sargent, 269 U.S. 328, 331(1926) A party seeking to annul legislation on constitutional grounds must show not only that the statute is invalid, but that "he has sustained or is immediately in danger of sustaining some direct injury as the result of its enforcement." Id. (citing Commonwealth of Massachusetts v. Mellon, 262 U.S. 447, 488 (1923)). See also El Dia, Inc., v. Hernandez Colon, 963 F.2d 488, 494 (1st Cir. 1992) ("Uncertain questions of constitutional law should be addressed only when absolutely necessary.").

J.S. asserts that he is entitled to have the court address the constitutionality of the Virginia medical malpractice cap before he proceeds with his negligence lawsuit against WPC. He first argues that the immediacy and reality of the need for a declaratory judgment is

7

established by the imminent prospect of a medical malpractice trial and the fact that he

anticipates that WPC will move to dismiss his case based on the damages cap. However, at

this point in the litigation, if the court were to declare the statute unconstitutional, J.S. would

not be entitled to relief and any opinion by the court would merely be "advising what the law

would be" if he were to prevail on his negligence cause of action. Absent a determination by

a factfinder that WPC is liable for his injuries, J.S. cannot show that he has sustained or is

immediately in danger of sustaining a direct injury as the result of the damages cap.

J.S. makes a similar argument with regard to standing.[1] The question of whether a party

has standing focuses on "'[w]hether a party has a sufficient stake in an otherwise justiciable

controversy to obtain judicial resolution of that controversy.'" Lott v. Scottsdale Ins. Co., 811

F.Supp.2d 1224, 1228-29 (E.D. Va. 2011) (quoting Sierra Club v. Morton, 405 U.S. 727, 731

(1972)). To establish standing, a litigant must show (1) an injury in fact; (2) that is fairly

traceable to the defendant's conduct; and (3) that is likely to be redressed by a favorable

decision. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)). An "injury in fact" is

one that is concrete and particularized and "actual or imminent, not 'conjectural' or

_____

[1] The doctrines of "standing," "ripeness," and "mootness" have evolved to address the notion that "federal judicial power is to be exercised to strike down legislation, whether state or federal, only at the instance of one who is himself immediately harmed, or immediately threatened with harm, by the challenged action." Poe, 367 U.S. at 503-04. The three doctrines "are simply subsets of Article III's command that the courts resolve disputes rather than emit random advice." Bryant v. Cheney, 924 F.2d 525, 529 (4th Cir. 1991). "Standing" ensures that the party seeking relief has a personal stake in the outcome. Gill v. Whitford, 138 S.Ct. 1916 (2018). "Ripeness" can be characterized as "standing on a timeline" and concerns the appropriate timing of judicial intervention to prevent courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements. J.E.C.M. by and Through His Next Friend Saravia v. Lloyd, 352 F.Supp.3d 559, 576 (E.D. Va. 2018) (citing Thomas v. Anchorage Equal Rights Comm'n, 220 F.3d 1134, 1138 (9th Cir. 2000) (en banc); In re Naranjo, 768 F.3d 332, 347 (4th Cir. 2014); Abbot Labs. v. Gardner, 387 U.S. 136, 148 (1967)). "[M]ootness ensures that the dispute is sufficiently concrete through all stages of the proceeding; '[a] case that becomes moot at any point … is no longer a Case or Controversy for purposes of Article III.'" Id. (quoting United States v. Sanchez-Gomez, 138 S.Ct. 1532, 1537 (2018)).

'hypothetical.'" Id. at 560 (quoting Whitmore v. Arkansas, 495 U.S. 149, 155 (1990)). At this point, J.S. cannot show that he has an actual injury because a finding has not been made that WPC is liable for his injuries such that he would be entitled to compensation were it not for the damages cap. Accordingly, he lacks standing to challenge the damages cap.

**B.**

J.S. also contends that the constitutionality of the damages cap is ripe for adjudication. "The issue of ripeness entails an analysis considering the fitness of the issues before the court, as well as the hardship that the parties will experience if the court withholds consideration of the dispute." Scoggins v. Lee's Crossing Homeowners Ass'n, 718 F.3d 262, 270 (2013) (citing Lansdowne on the Potomac Homeowners Ass'n, Inc. v. OpenBand at Lansdown, LLC, 713 F.3d 187, 195 (4th Cir. 2013)). "A case is fit for judicial decision when the issues are purely legal and when the action in controversy is final and not dependent on future uncertainties." Miller v. Brown, 462 F.3d 312, 319 (4th Cir. 2006) (citing Charter Fed. Sav. Bank v. Office of Thrift Supervision, 976 F.2d 203, 208 (4th Cir. 1992)). "Stated alternatively, '[a] claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all.'" Scoggins, 718 F.3d at 270 (citing Texas v. United States, 523 U.S. 296, 300 (1998) and Bryant Woods Inn, Inc. v. Howard Cnty., Md., 124 F.3d 597, 602 (4th Cir. 1997)).

In J.S.'s case, the issue of the constitutionality of the damages cap is not fit for adjudication because it is not purely a legal issue. Rather, the question hinges upon a future factual determination that health care professionals working for WPC caused or exacerbated J.S.'s injuries. That finding is uncertain at this point. If a factfinder determines that WPC was

not liable for J.S.'s injuries, or that the injuries did not exceed the damages cap, the court will

not need to address the constitutionality of the damages cap. Thus, the court finds that this

issue does not meet the first prong of the ripeness test.

The second, or hardship, prong of the ripeness doctrine is measured "by the immediacy

of the threat and the burden imposed on the [plaintiff] who would be compelled to act under

threat of enforcement of the challenged law." Charter Federal Sav. Bank, 976 F.2d at 208-09.

In considering the hardship to be balanced against the fitness of the issues for review, a court

may consider the cost of delaying review. Doe v. Virginia Dept. of State Police, 713 F.3d 745,

759 (4th Cir. 2013) (citing Miller, 462 F.3d at 319). "A case will cause hardship when it

"create[s] adverse effects of a strictly legal kind, that is, effects of a sort that traditionally would

have qualified as harm." Ohio Forestry Ass'n, Inc. v. Sierra Club, 523 U.S. 726, 733 (1998).

Examples of legal harms include commanding someone to do something or refrain from doing

something, granting, withholding, or modifying any formal legal license, power, or authority,

or subjecting someone to civil or criminal liability. Id. (paraphrasing United States v. Los

Angeles & Salt Lake R. Co., 273 U.S. 299, 309-10 (1927)). In Ohio Forestry Ass'n, the Court

noted that it has not considered litigation cost saving sufficient by itself to justify review of a

case that is otherwise unripe. Id. at 735.

Where threatened action by the government is concerned, a plaintiff is not required to

expose himself to liability before bringing a lawsuit to challenge the basis for the threat.

MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 128-29 (2007) (citing as examples Terrace

v. Thompson, 263 U.S. 197 (1923) (addressing constitutionality of Anti-Alien Land Law prior

to parties entering lease agreement when entering lease first would subject them to civil and

10

criminal penalties); Village of Euclid v. Ambler Realty Co., 272 U.S. 365 (1926) (evaluating constitutionality of zoning ordinance prior to any violation because ordinance deterred buyers from purchasing parcel of land subject to ordinance's restrictions and thus greatly reduced its value); Ex parte Young, 209 U.S. 123 (1908) (allowing constitutional challenge to Minnesota law imposing penalties for violation of an order setting rates for transportation when violation would result in a penalty so drastic that railways would risk confiscation of their property and imprisonment of their personnel for violations); Steffel v. Thompson, 415 U.S. 452 (1974) (allowing constitutional challenge to statute outlawing distribution of handbills where plaintiff had twice been warned by police to stop handing out literature or he would be prosecuted)). See also Citizens United v. Fed. Election Comm., 558 U.S. 310 (2010) (granting declaratory relief to non-profit corporation that feared it could be subject to civil and criminal penalties if it released a film about a candidate seeking nomination in an upcoming election).

Similarly, when a plaintiff's self-avoidance of imminent injury is coerced by the threatened action of a private party, rather than the government, lower federal courts and state courts have accepted jurisdiction in Declaratory Judgment Act cases. MedImmune, 549 U.S. at 130 (citing as examples Keener Oil & Gas Co. v. Consolidated Gas Util. Corp., 190 F.2d 985 (10th Cir. 1951) (noting that in a breach of contract claim, a party need not wait until he has committed an act which the other party asserts will constitute a breach, but may seek relief by declaratory judgment and have controversy adjudicated to avoid risk of damages or other untoward consequences); American Machine & Metals, Inc. v. De Bothezat Impeller Co., 166 F.2d 535 (2d Cir. 1948) (finding a justiciable controversy when future exercise by plaintiff of its right to terminate contract under which it paid a license fee to manufacture and sell

11

defendant's product would result in defendant suing plaintiff to stop manufacture and sale of plaintiff's own product); Hess v. Country Club Park, 2 P.2d 782, 783 (Cal. 1931) (finding declaratory judgment appropriate when forcing property owner to test validity of restrictive covenant by making desired improvements to his property could result in his forfeiting his investment or title to his land in order to obtain an adjudication of his rights)).

J.S. does not face the sort of hardship contemplated by the cases cited above. He does not run the risk of incurring civil or criminal liability for any action he may take or not take, and he is not contemplating breaching a contract, rule, or regulation and incurring costs or penalties based on such action or inaction.

J.S. contends that he will suffer a hardship if the constitutionality of the damages cap is not adjudicated before the liability determination is made, because he will not have a cause of action and therefore will lose his constitutional right of access to courts. However, J.S. is not at risk of losing his right of access to the court, as he is free to pursue his case against WPC and seek a jury verdict on liability. To be sure, J.S. does run the risk of incurring the costs of a trial, obtaining a favorable jury verdict, and not being able to collect damages from WPC if the court finds that the damages cap remains constitutional. However, saving the cost of litigation is not sufficient by itself to justify review in a case that is otherwise unripe. Ohio Forestry Ass'n, Inc., 523 U.S. at 735.

Based on the foregoing, the court finds that the issue of the constitutionality of the Virginia medical malpractice cap is not ripe for adjudication. The court finds further support for this conclusion in the cases from other jurisdictions cited by the parties and discussed below.

J.S. points to three cases where he asserts that courts decided declaratory judgment actions in circumstances similar to his. In Franklin v. Mazda Motor Corp., 704 F.Supp. 1325 (D. Md. 1989), a plaintiff in a products liability action sought a declaratory judgment that a Maryland cap on noneconomic damages[2] of $350,000 was unconstitutional. Aside from the request for declaratory judgment, the plaintiff's complaint consisted of one count alleging strict liability for a malfunctioning automobile which caused her damages, including pain and suffering. The plaintiff sought $750,000 in damages, and all but approximately $20,000 were claimed by her as compensation for noneconomic damages. Id. at 1327.

Defendant Mazda argued that the issue of the constitutionality of the damages cap would not become ripe until a jury returned a verdict for noneconomic damages greater than $350,000. Id. at 1328. The State of Maryland intervened, agreeing that the issue of the statute's constitutionality was not ripe. Franklin disagreed, as summarized by the district court:

> Plaintiff responds that the question must be resolved now. Because the law, as it now stands, limits Franklin to a claim of $350,000 for noneconomic damages, her counsel's presentation to the jury might well be affected. She questions whether her counsel is entitled to ask a jury for more than the law allows. She also argues that the jury must be instructed as to the cap limit.

Id. The district court seized on the last argument, finding that the language of the statute-- "[i]n any action for damages for personal injury … an *award* for noneconomic damages may not exceed $350,000," (quoting Courts Art., § 11-108(b), Md. Code (emphasis added by Maryland court))--indicated that the jury, as trier of fact, needed to be instructed about the

---

[2] Noneconomic damages as defined in the statute include pain, suffering, inconvenience, physical impairment, disfigurement, loss of consortium, or other non-pecuniary damages. Franklin, 704 F. Supp. at 1327 (citing Courts Art., § 11-108(a) Md. Code).

limit prior to rendering its judgment and awarding noneconomic damages. Id. at 1328-29.

The court concluded:

> In this case, the issue of damages for pain and suffering is not hypothetical; plaintiff has been injured and contends that the damages sustained for pain and suffering exceed the cap amount. The Court and jury are presented with the real question whether the statute is applicable. Because the question is of the type ordinarily decided by courts in preparation for trial and will have to be resolved to instruct the jury, it is ripe in the legal sense for decision at this time.

Id. at 1329.  In this respect, the Maryland statute differs markedly from Va. Code § 8.01-581-

15. As the Virginia Supreme Court held in Etheridge,

> The limitation on medical malpractice recoveries contained in Code § 8.01-81.15 does nothing more than establish the outer limits of a remedy provided by the General Assembly. A remedy is a matter of law, not a matter of fact. A trial court applies the remedy's limitation only *after* the jury has fulfilled its fact-finding function. Thus, Code § 801-581.15 does not infringe upon the right to a jury trial because the section does not apply until after a jury has completed its assigned function in the judicial process.

237 Va. at 96, 376 S.E. 2d at 529. Citing Duke Power Co. v. Carolina Environmental Study Group, Inc., 438 U.S. 59 (1978), and Pacific Gas & Elec. Co. v. State Energy Resources Conservations and Dev. Comm'n, 461 U.S. 190 (1983), the Franklin court concluded "[i]n the present case, no amount of fact-finding or delay would aid the Court in resolution of what essentially is a purely legal question." 704 F. Supp. at 1329.[3] In contrast, as there has been no liability determination as to WPC in this case, fact-finding remains to be done here.

---

[3] In Duke Power, the Supreme Court found a constitutional challenge to a federal statute placing a limitation on damages for nuclear accidents to be ripe, even though no nuclear accidents had yet occurred. Even without a nuclear accident, the Court found immediate adverse effects from operation of nuclear plants, including thermal and aesthetic consequences to lakes and the emission of nonnatural radiation, to be "sufficiently concrete to satisfy constitutional requirements." 438 U.S. at 73. As to ripeness, the Court concluded that delayed resolution of the legal issue would frustrate one of the key purposes of the statute – "the elimination of doubts

J.S. also cites <u>Simms v. Holiday Inns, Inc.</u>, 746 F.Supp. 596 (D. Md. 1990), where the district court determined on summary judgment that the Maryland cap on noneconomic damages was applicable to wrongful death actions and found it to be constitutional. However, the court did so without elaborating on its reasons for deciding the issue was ripe and did not appear to weigh the factors that determine justiciability. Thus, the opinion offers limited support to J.S.'s position on the issue.

J.S. cites a third case, <u>Arbino v. Johnson & Johnson</u>, No. 3:06CV40010, 2006 WL 1720538 (N.D. Ohio June 20, 2006), where the district court certified to the Ohio Supreme Court the question of the constitutionality of a package of restrictions on tort actions passed by the Ohio legislature. <u>Id.</u> at *2. However, although J.S. is correct that the court addressed the issue early in the litigation because it implicated the financial impact upon both parties and negatively impacted settlement efforts, the court certified the question to the Ohio court rather than rule on the constitutionality of the question directly, noting the following:

> [W]arnings against premature adjudication of constitutional questions bear heightened attention when a federal court is asked to invalidate a State's law, for the federal tribunal risks friction-generating error when it endeavors to construe a novel state Act not yet reviewed by the State's highest court. . . . Therefore, taking advantage of certification to a state court may greatly simplify an ultimate adjudication in federal court.

---

concerning the scope of private liability in the event of major nuclear accident," <u>id.</u> at 82, which was critical given the position of the utility industry that the liability cap was essential to construction and continued operation of nuclear power plants. Likewise, in <u>Pacific Gas & Elec.</u>, the Court found ripe the question whether a California statute placing a moratorium on nuclear power plant construction was preempted by the Atomic Energy Act of 1954, concluding that "[t]o require the industry to proceed without knowing whether the moratorium is valid would impose a palpable and considerable hardship on the utilities, and may ultimately work harm on the citizens of California." 461 U.S. at 202-03. In each of these cases, the Court found that delaying resolution of an entirely legal issue had immediate consequences for citizens and the nuclear power industry. Here, in contrast, those consequences only arise if a jury makes a factual determination that WPC is liable for J.S.'s injuries in an amount exceeding the damages cap.

Arbino, 2006 WL 1720538 at \*1 (quoting Arizonians for Official English v. Ariz., 520 U.S. 43, 79 (1997) (per curiam) (internal citations and quotation marks omitted).[4] Arbino does not support J.S.'s argument that this court should address the constitutionality of the damages cap at this point in the litigation.

WPC cited several cases where courts declined to address the constitutionality of a damages cap until after liability was established. See Gomez v. Ford Motor Co., No. 5:15-CV-866-DAE, 2018 WL 3603119, at \*4 (W.D. Tex. Feb. 5, 2018) (declining to address constitutionality of punitive damages cap on summary judgment because punitive damages would not become an issue unless the plaintiff obtained a verdict for compensatory damages and a verdict for punitive damages in excess of the statutory caps); Dixon v. United States, No. 15-23502-Civ-Scola, 2017 WL 5643318, at \*5 (S.D. Fla. Feb. 13, 2017) (declining to address constitutionality of statutory cap on noneconomic damages in medical malpractice case before adjudication of negligence or an award of damages that exceeded cap); Cline v. Publix Supermarkets, Inc., No. 3:15-0275, 2017 WL 67945 (M.D. Tenn. Jan. 6, 2017) (noting that parties agreed that constitutionality of noneconomic damages cap was not ripe until plaintiff received a noneconomic damages verdict in excess of the cap); Gummo v. Ward, No. 2:12-00060, 2013 WL 5446074, at \*1-2 (M.D. Tenn. Sept. 30, 2013) (finding constitutional challenge to noneconomic and punitive damages caps not ripe unless and until plaintiffs obtained verdict in excess of one or more of the caps); Russo-Wood v. Yellowstone County,

---

[4] The Virginia Supreme Court has discretion to answer questions of law certified to it by certain other courts "if a question of Virginia law is determinative in any proceeding pending before the certifying court and it appears there is no controlling precedent on point in the decisions of this Court or the Court of Appeals of Virginia." Va. Sup. Ct. Rule 5:40.

No. CV 17-38-BLG-TJC, 2019 WL 1102680, at *13 (D. Mont. March 7, 2019) (agreeing with

parties that constitutionality of cap on damages against government was not ripe until jury

awarded damages in excess of cap). These cases support the conclusion that the

constitutionality of the medical malpractice cap is not ripe for adjudication.

## IV.

Upon consideration of all the factors presented by the parties regarding justiciability,

the court determines that at this point in the litigation, the issue of the constitutionality of the

Virginia medical malpractice damages cap does not present a case or controversy suitable for

determination under Article III of the United States Constitution. The court finds that it would

be acting outside its jurisdiction if it were to decide the issue prior to a jury verdict that WPC

is liable for J.S.'s injuries in an amount in excess of the statutory cap. Accordingly, the court

declines to consider the constitutionality of the statute at this time and **DENIES** without

prejudice J.S.'s request for relief under the Declaratory Judgment Act.

It is so **ORDERED**.

ENTERED:     March 3, 2021

Michael F. Urbanski
Chief U.S. District Judge
2021.03.03 18:17:37 -05'00'

Michael F. Urbanski
Chief United States District Judge